**Michael A. ADAMS, Appellant,**

**v.**

**Albert O. WADDELL et al., Appellees.**

**Albert O. WADDELL and Ethel Waddell, Cross-Appellants,**

**v.**

**Michael A. ADAMS, Cross-Appellee.**

**Nos. 2269 and 2270.**

Supreme Court of Alaska.

Dec. 1, 1975.

Peter B. Walton, Peter Walton & Associates, Anchorage, for appellant and cross-appellee.

James C. Merbs, Anchorage, for appellees and cross-appellants Waddells.

David H. Bundy, Ely, Guess & Rudd, Anchorage, for appellee Alaska State Bank.

---

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and BURKE, Justices.

## OPINION

PER CURIAM.

On April 22, 1970, Michael A. Adams, as lessor, and Albert O. Waddell and Ethel Waddell, husband and wife, as lessees, entered into a lease with option agreement. Adams leased to the Waddells certain real property on DeBarr Road in Anchorage, Alaska, for a term of twenty years and granted to the Waddells an option to purchase the property exercisable either on April 1, 1972, or on April 1, 1974. The option agreement, contained in the lease as paragraph 5, reads as follows:

> For and in consideration of the terms of this lease, the lessees are hereby granted the exclusive option to purchase the premises for a total price of One Hundred Fifty Thousand Dollars ($150,000.-00). However, the option may be exercised only on April 1, 1972, or on April 1, 1974. Should the lessees fail to exercise the option on either of those two dates, the lessees shall have no further right to purchase the premises. The purchase price of One Hundred Fifty Thousand Dollars ($150,000.00) shall be amortized over a period of ten (10) years, with interest at eight percent (8%) per annum. Payments shall be made monthly.

The Waddells built a roller rink on the property leased from Adams and financed their construction effort in part with funds borrowed from appellee Alaska State Bank ("the Bank"), executing in favor of the Bank three deeds of trust, one of which, securing a loan in the amount of $110,000, was in effect at the time of the trial and is still in effect.

The Waddells spent a total of $314,019.-52 in the construction of the roller rink, including the funds borrowed from the Bank. Paragraph 21 of the lease agreement, relating to improvements, states in part as follows:

> In the event lessees construct on said premises any permanent improvements, the same shall remain on the premises at the termination of this lease or any extension thereof, unless the option herein granted is exercised, and shall become the property of the lessor. Lessees may, however, remove any temporary structures or temporary improvements which can be removed without damaging the property.

On March 5, 1971, M. C. Lowe filed a claim of lien against the premises, alleging that he had not been paid for work done for the Waddells on the construction of their roller rink. Lowe subsequently brought suit to foreclose his claim of lien, naming the Waddells, Adams, and the Bank as defendants. This suit was dismissed on March 23, 1972.

Lowe's complaint made Adams aware that the Bank claimed an interest in the premises, and on October 1, 1971, Adams, through his attorney, gave notice to the Waddells that the lease was terminated because the Waddells had permitted a labor lien and liens in favor of the Bank to attach to the premises, all in alleged violation of the lease with option agreement. The Waddells did not quit the premises as requested by Adams. On November 28, 1971, prior to the first option date, Adams filed suit against the Waddells seeking forfeiture of the leasehold and improvements and removal of the Waddells from the premises on the basis that the lease agreement had been breached by the lien claim and the deeds of trust. The Waddells counter-claimed for specific performance.

On April 1, 1972, the first date under the agreement when the option was capable of being exercised, the Waddells presented themselves at Adams' residence and tendered to him a note for $150,000.00, payable over ten years with 8% interest, containing a pre-payment provision. The

Waddells presented Adams with a deed of trust, a request for reconveyance and a deed of reconveyance, usually executed in connection with a note and deed of trust transaction in Alaska. The Waddells further presented Adams with a warranty deed to the premises which they requested him to sign, and with the first payment on the $150,000.00 purchase price. Adams told the Waddells that he considered the lease with option agreement terminated, and he refused to go forward with the transaction, execute the deed, or accept the note, deed of trust and other papers, or the first payment on the $150,000.00.

The Bank· intervened in the action on September 19, 1972, without objection by the other parties. Adams later amended his complaint, removing the allegation that the lease had been breached by the materialman's lien, and relying only upon the deeds of trust to the Bank as grounds for forfeiture and termination of the agreement.

Following the trial, at which Adams testified that he had not intended to permit a pre-payment provision in the note and that he believed that his fee-simple interest in the property was encumbered by the deeds of trust which the Waddells had given to the Bank, the superior court ruled against Adams and in favor of the Waddells and the Bank on all allegations of Adams' complaint; and the court granted the Waddells' application for specific performance of their option agreement. Specifically, the court found that the documents tendered by the Waddells on April 1, 1972, were implied in the provisions of paragraph 5 of the lease with option agreement, with the exception that the pre-payment provision contained in the note was an additional term not incorporated in or implied by the parties' earlier agreement. However, the court found that if Adams had requested the Waddells to remove this provision on April 1, 1972, the Waddells would have done so. The court found that neither the M. C. Lowe lien claim nor the deeds of trust given to the Bank amounted to breaches of the lease. The court found that the Waddells' exercise of their option on April 1, 1972, was sufficient; and the court dismissed Adams' claims against the Waddells and the Bank and ordered Adams specifically to perform the option agreement in favor of the Waddells. In addition and for the purpose of clarifying the record, the court ordered the Bank to execute an agreement specifically subordinating its deed of trust against the premises to the deed of trust to be given by the Waddells to Adams in connection with the exercise of their option. The court ordered Adams to pay attorney fees to the Waddells and to the Bank, each in the amount of $5,000.00. Adams appealed but narrowly limits his grounds for appeal to the single issue "of whether the trial court erred in holding that the Uniform Commercial Code applies to acceptances (exercises) of offers to sell real estate (options)."[1]

The basic legal argument of the purchasers is that they properly exercised their option to purchase the property and that a contrary ruling would result in a substantial forfeiture to them.[2]

We conclude that the trial court was correct in ruling that the purchasers had properly exercised their option to purchase. While it is clear that the trial court used as a legal standard provisions similar to those embodied in the Uniform Commercial Code or sale of goods (see 45.05.-062) in determining whether the option

---

1. Appellant's Brief. "ADAMS' Position in this Appeal," pages 6–7.

2. After entering into the lease purchase agreement appellees, in conjunction with the bank, constructed a building on the premises and expended $314,019.52 for improvements on the property in question. Subsequently, purchasers tendered to seller a promissory note for $150,000.00, payable over ten years at eight percent interest, and tendered or paid into the Registry of the Court all required lease and/or purchase payments.

**218**

had been properly exercised, this is not error.

In *Rego v. Decker,* 482 P.2d 834 (Alaska 1971), this court inferred that the adoption of the Uniform Commercial Code in Alaska showed legislative judgment to relax strict requirements and mechanical concepts of contract interpretation in favor of realization of the reasonable expectations that have been induced by the making of the promise.[3] This court then decreed specific performance of an option agreement where certain terms were ambiguous because it found there was a reasonably certain basis for resolving such ambiguities and giving an appropriate remedy.

The trial court followed a similar process in this case. It used the standards codified for the sale of goods as relevant standards in determining whether there had been sufficient compliance by the purchasers of the option contained in paragraph 5. We agree that they are relevant.

The court found that the inclusion of a payment acceleration clause in the acceptance documents was not a conditioning factor on the acceptance because it would have been removed had the seller objected.[4] It then conditioned specific performance on the removal of such a clause from the purchase documents as tendered.

While a greater degree of certainty is required for specific performance than for damages, less certainty is required where the party seeking specific performance has shifted his position in reliance on the supposed contract than where the contract is wholly unperformed on both sides.[5] Such a view and the reasoning expressed by the trial court also appears to be in conformity with the better reasoned approach to acceptance by the legal scholars.[6]

The decision of the trial court is affirmed.[7]

---

3. 1A Corbin, Contracts § 1, at 2 (1963).

4. The court further found that the purchasers had no knowledge of the seller's objection to payment acceleration because of his tax status, and that the previous agreements had been silent on such an issue.

5. Rego v. Decker, 482 P.2d 834, 838 (Alaska 1972).

6. *See* 1A Corbin, Contracts § 264, at 523–524 (1963).

. . . On the other hand, a proper notice of acceptance is not made inoperative by the fact it is accompanied by a proposal for some substitute arrangement subject to the other party's consent. . .

Restatement of Contracts § 62 (1933) ; *see also* 1 S. Williston, Contracts § 61D, at 205 (3d ed. 1957).

7. We decline to consider the issues raised by the cross appeal in view of the inadequate briefing and presentation of these issues.